# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

JO S. RICH,                  )
                         )
        **Plaintiff,**       )
                         )
        **v.**           )    **Case No. CIV-14-498-SPS**
                         )
CAROLYN W. COLVIN,    )
**Acting Commissioner of the Social**  )
**Security Administration,**    )
                         )
        **Defendant.**    )

## OPINION AND ORDER

The claimant Jo S. Rich requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). She appeals the Commissioner's decision and asserts that the Administrative Law Judge ("ALJ") erred in determining she was not disabled. For the reasons discussed below, the Commissioner's decision is hereby REVERSED and REMANDED to the ALJ for further proceedings.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if h[er] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy[.]" *Id.* § 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[1]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). *See also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991). But the Court must review the record as a whole, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts

---

[1] Step one requires the claimant to establish that she is not engaged in substantial gainful activity. Step two requires the claimant to establish that she has a medically severe impairment (or combination of impairments) that significantly limits her ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or her impairment *is not* medically severe, disability benefits are denied. If she *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has a listed (or "medically equivalent") impairment, she is regarded as disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must show that she lacks the residual functional capacity (RFC) to return to her past relevant work. At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given her age, education, work experience and RFC. Disability benefits are denied if the claimant can return to any of her past relevant work or if her RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). *See also Casias*, 933 F.2d at 800-01.

## Claimant's Background

The claimant was born December 4, 1970, and was forty-two years old at the time of the administrative hearing (Tr. 24). She completed high school, and has worked as a customer service representative, benefits clerk, and line appliance assembler (Tr. 37, 258). The claimant alleges inability to work since September 30, 2010, due to bleeding disorders, protein c deficiency, hyperhomocysteinemia, factor 5 mutation, chronic recurring breathing/allergy problems, type 2 diabetes, history of pulmonary embolism, high blood pressure, uncontrollable PT/INR blood results, degenerative disc disease and sciatica nerve pain, spinal stenosis, sleep apnea, atrial septum defect, morbid obesity, possible right pulmonary hypertension, major depressive disorder, and anxiety disorder (Tr. 257-258).

## Procedural History

On August 11, 2011, the claimant applied for benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-85. Her applications were denied. ALJ Doug Gabbard, II, conducted an administrative hearing and determined that the claimant was not disabled in a written opinion dated July 30, 2013 (Tr. 20-39). The Appeals Council denied review, so the ALJ's written opinion is the Commissioner's final decision for purposes of this appeal. *See* 20 C.F.R. §§ 404.981, 416.1481.

## Decision of the Administrative Law Judge

The ALJ made his decision at step five of the sequential evaluation. He found that the claimant had the residual functional capacity (RFC) to perform limited semi-skilled work (work which requires some detailed skills but does not require doing more complex work duties) where interpersonal contact with supervisors and coworkers is on a superficial work basis, as well as no contact with the general public or crowds. Additionally, he determined that she could only occasionally climb, balance, stoop, kneel, crouch, or crawl; that she could not work at assembly line speeds or pace; and that she must not work around loud noises (Tr. 28). The ALJ then concluded that although she could not return to her past relevant work, she was nevertheless not disabled because there was work she could perform, *e. g.*, housekeeper/cleaner, conveyor line bakery worker/inspector, and bottling line attendant (Tr. 37-38).

## Review

The claimant argues that the ALJ erred by: (i) failing to properly evaluate the medical and nonmedical source evidence, and (ii) failing to properly assess her credibility, including her pain. Because the Court finds that the ALJ failed to properly evaluate the evidence in the record, the decision of the Commissioner must be reversed and the case remanded for further proceedings.

The ALJ determined that the claimant had the severe impairments of degenerative disc disease of the lumbar spine, obesity, and affective, anxiety, and substance addiction disorders, as well as the nonsevere impairments of carpal tunnel syndrome (status post-surgery), bleeding disorder, protein C deficiency, hyperhomocysteinemia, factor V

mutation, pulmonary embolism, uncontrollable PT/INR, atrial septum defect, hypertension, diabetes, sleep apnea, insomnia, breathing problems, chronic allergies, and sternotomy (status post-surgery). The medical evidence in this case reflects that she underwent an MRI of the lumbar spine in April 2010 which revealed degenerative disc disease and degenerative joint disease at L5-S1, creating bilateral foraminal stenosis, moderate-to-severe on the right and mild-to-moderate on the left, in addition to other less significant disk and facet joint abnormalities within the thoracolumbar spine (Tr. 633). Following a fall off a ladder in February 2011, the claimant was advised to be on bed rest and avoid lifting, pulling, straining, and bending for 48 days (Tr. 647). A CT of the cervical spine at that time revealed degenerative changes at the C6-C7 level (Tr. 652). Additionally, the entire record contains numerous hospital visits and reports by the claimant in which she reported chest pains and shortness of breath.

The claimant's treating physician, Dr. Ali Shah, completed a physical RFC assessment of the claimant on July 27, 2011, in which he noted her diagnoses as pulmonary embolism and anxiety, and that she also had low back pain and morbid obesity (Tr. 662). He indicated that these symptoms could last at least twelve months and that the claimant was not a malingerer, and indicated that her psychological condition affected her physical condition, including occasionally her attention and concentration for performing even simple work tasks (Tr. 663). He thought she could handle low stress jobs, walk two city blocks without rest or severe pain, sit forty-five minutes at a time, stand one hour at a time but stand/walk less than two hours in an eight-hour workday, and would need to walk around for about ten minutes and be able to shift positions at will as

well as take unscheduled breaks (Tr. 664). He stated she could frequently lift up to ten pounds and twenty pounds occasionally, but could only occasionally twist, stoop (bend), crouch/squat, and climb ladders or stairs (Tr. 665-666). He estimated she would miss two days per month as the result of impairments or treatment (Tr. 666). That same month he completed a diabetes mellitus medical source statement (MSS), in which he stated she had a fair prognosis, that she could sit/stand/walk about two hours in an eight-hour workday, did not need a job that permitted her to shift positions at will, but did need a job that included periods of walking around (Tr. 671). Additionally, he indicated she was capable of low stress work, and would be absent three days per month (Tr. 673). Dr. Shah's notes indicate he treated her for approximately ten months (until July 2011) but discharged her as a patient because she failed to have blood workups done when he ordered them and her failure to follow his recommendations could cause injury without them (Tr. 677). His notes reflect she had previously informed him of an inability to have the blood workups done because she lost her insurance and could not afford to do so (Tr. 680). Dr. Shah treated the claimant for her physical impairments including diabetes, hypertension, obesity and a regimen of anti-coagulants for a history of pulmonary embolism, and also prescribed medications for depression and anxiety (Tr. 677-690).

As to the claimant's mental impairments, Dr. Steven Lahr completed a mental status form on June 22, 2010, prior to her alleged onset date of September 30, 2010, indicating that the claimant had a depressed mood, makes occasional eye contact, had no hallucinations, and some psychomotor slowing, and noted that most stressors would increase the claimant's symptoms (Tr. 1811). He stated that she was unable to leave her

house most days, was not engaging in activities, she needed continued medication monitoring, and her prognosis was guarded because of the length of her symptoms and her co-morbidities (Tr. 1811). He stated she could remember, comprehend, and carry out simple tasks but was impaired as to complex tasks, and that she could not respond to work pressure, supervision, and coworkers (Tr. 1811). The claimant presented with suicidal ideation on July 29, 2010 (Tr. 1853). She was then hospitalized with suicidal ideation on September 1, 2010, and assessed a GAF of 20 (Tr. 1954). Notes reflect that Laureate in Tulsa, Oklahoma was full, and the claimant was discharged on September 3, 2010 (Tr. 1959-1960). That same month, a state reviewing physician, after noting her suicide attempt, completed a mental RFC assessment indicating the claimant could perform simple and some more complex tasks, could adapt to a work setting, could relate to co-workers and supervisors on a superficial work basis, and could have some limited contact with the general public (Tr. 1979).

The claimant began treatment at Carl Albert Community Mental Health Center, and the medical management notes reflect a number of adjustments to medications, and that they were often only partially effective (Tr. 1045-1048, 1077-1084, 1112, 2015). By December 5, 2012, notes reflect the claimant reported doing better and that her response to medication was partially effective (Tr. 2020).

On October 1, 2011, Susan Odunukwe, LPC and Ph.D., conducted a mental status examination of the claimant. She assessed the claimant with major depressive disorder, as well as generalized anxiety disorder and polysubstance abuse by history, and noted a number of physical impairments at Axis III, in addition to a global assessment of

functioning score of 45 (Tr. 873). After noting a number of the claimant's reports, Dr. Odunukwe gave the claimant a poor prognosis due to deterioration in her physical condition and the presence of significant depression. She stated that it was unlikely the claimant would be able to engage in meaningful employment due to the worsening of her medical condition in combination with deteriorating mental health, and that this situation warranted continued psychological and pharmacological intervention (Tr. 873).

That same month, the claimant's new treating physician at Pushmataha Family Medical Center, Dr. Ed Ellis, stated that the claimant was intelligent but self destructive, mentally ill, and very angry when he would not prescribe her Ambien (Tr. 881).

On December 10, 2011, Frank E. Mann, M.S. LPC LADC-C, wrote a letter stating that he had known the claimant for a year and observed her efforts to get and keep employment, but her health prevented that from happening. He diagnosed her with major depression recurrent, generalized anxiety disorder, and stated he believed she was not capable of maintaining employment "due to the seriousness of her mental health and physical health issues" and that she was willing to work but unable to keep a job (Tr. 890).

On December 13, 2011, Fran Friedman, Ph.D., completed a mental RFC assessment, finding the claimant was moderately limited in the ability to understand and remember detailed instructions, carry out detailed instructions, make simple work-related decisions, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting (Tr. 895-896). She stated that the claimant was capable of understanding, remembering, and completing simple one and

two step tasks without significant limitation; that she may have occasional difficulty with more complex tasks due to psychological symptoms; that her ability to sustain job performance may also be compromised by her physical limitations as her level of pay may affect her concentration and stamina; that she is generally able to interact appropriately in a social and work-like setting; and that she can adapt to her routine environment but may have some trouble dealing with her reduced physical functioning and level of pain (Tr. 897). A different unsigned, undated mental RFC assessment found the claimant was moderately limited in the three typical categories of understanding and remembering detailed instructions, carrying out detailed instructions, and interacting appropriately with the general public. This assessment stated in Section III that the claimant could perform simple and some complex tasks, relate to others on a superficial work basis, and adapt to a work situation (Tr. 935-937).

As to her physical impairments, on December 20, 2011, a state reviewing physician found the claimant could perform light work, but was limited to only occasionally performing all postural limitations (Tr. 914-915). She found Dr. Shah's assessment only partially supported, stating there was no evidence the claimant could not perform normal standing/walking (Tr. 920). On March 19, 2012, a state reviewing physician determined that this assessment was affirmed, despite noting that the claimant's updated activities of daily living reflected an ability to lift no more than ten pounds (Tr. 1068).

The record also contains a number of Third Party Function Reports, submitted by the claimant's grandmother, friend, and uncle. Her grandmother completed several,

indicating that the claimant had been hospitalized more than a dozen times since April 2009, that the claimant struggled with personal care and meal preparation, and that any chores she attempts take a long time because she had to take frequent breaks (Tr. 277-280, 467-468, 1791-1794). Additionally, she noted that the claimant had a short attention span (about thirty minutes), could follow written instructions if it was not too complicated, and could follow spoken instructions if they were repeated two or three times (Tr. 282, 472). Her friend indicated that the claimant had been "slipping into serious depressive behavior patterns" over the past few years, and that personal care takes her a significant amount of time because of her back injuries (Tr. 288-289). He indicated that the claimant could pay attention for twenty minutes, but that she could follow written and spoken instructions (Tr. 293). The claimant's uncle noted that it takes her a long time to do household chores because she takes a lot of breaks (Tr. 337). He stated he did not think she had a problem paying attention and that she could follow written instructions, but that as to spoken instructions she "forgets a lot" (Tr. 340).

In his written opinion the ALJ summarized the claimant's hearing testimony, as well as the medical evidence. As to Dr. Shah's records and opinion, the ALJ summarized Dr. Shah's records, including that he released her as a patient for noncompliance. As to Dr. Shah's RFC and MSS assessments, the ALJ declined to give them controlling weight, finding that his examinations were "essentially unremarkable," she had continued to smoke despite repeated admonitions to stop, and he released her for noncompliance. The ALJ also found Dr. Lahr's assessment consistent with an RFC for semi-skilled work with superficial contact with supervisors and coworkers (Tr. 34-35), when he actually wrote

that she could remember, comprehend, and carry out simple tasks but was impaired as to complex tasks, and that she could not respond to work pressure, supervision, and coworkers (Tr. 1811). The ALJ then rejected Mr. Mann's other source opinion because as the ALJ he was not bound by it (Tr. 35). The ALJ also discussed Dr. Odunukwe's consultative examination at length, indicating he rejected her opinion the claimant could not retain employment, and gave little weight to her poor prognosis and GAF of 45, because: (i) her conclusions were inconsistent with her own exam findings, (ii) her conclusions were based on the claimant's own reports, (iii) "the medical records indicate that claimant has had few affective symptoms," and (iv) low GAF scores do not always indicate overall functioning (Tr. 35-36). Finally, the ALJ stated that all of the state reviewing physician exams were consistent with his concluding opinion pertaining to disability, without discussing (i) Dr. Friedman's specific mental RFC findings or attempting to contrast them with the less illuminating undated, unsigned mental RFC assessment in the record, or (ii) the updated state opinion reflecting the claimant was limited to lifting ten pounds (Tr. 36-37). As to the numerous Third Party Function Reports, the ALJ rejected them because none of the individuals were medically trained, they were not disinterested parties, and their statements were not consistent with the "preponderance of the opinions and observations by medical physicians in this case" (Tr. 37).

On appeal, the claimant asserts that the ALJ erred in his RFC analysis of Dr. Shah's opinion as well as Mr. Mann's opinion. The Court agrees and reverses on the basis of these arguments, while also noting that there are a number of additional errors

including the additionally-raised basis of an improper pain analysis, as well as improperly-evaluated Third Party Function Reports, that should likewise all be properly addressed upon remand. "An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional. . . . An ALJ must also consider a series of specific factors in determining what weight to give any medical opinion." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004), *citing Goatcher v. United States Department of Health & Human Services*, 52 F.3d 288, 290 (10th Cir. 1995). The pertinent factors include: (i) the length of the treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (iii) the degree to which the physician's opinion is supported by relevant evidence; (iv) consistency between the opinion and the record as a whole; (v) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (vi) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *See Watkins v. Barnhart*, 350 F.3d 1297, 1300-1301 (10th Cir. 2003), *citing Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001). Finally, if the ALJ decides to reject a treating physician's opinions entirely, "he must . . . give specific, legitimate reasons for doing so[,]" *Watkins*, 350 F.3d at 1301 [quotation marks omitted; citation omitted], so it is "clear to any subsequent reviewers the weight [he] gave to the treating source's medical opinion and the reasons for that weight." *Id*. at 1300 [quotation omitted].

The ALJ was required to evaluate for controlling weight any opinions as to the claimant's functional limitations expressed by his treating physicians. Although the ALJ noted the proper analysis at the outset of step four, he failed to properly apply it when he ignored the evidence in the record as to Dr. Shah's nearly year-long treatment (at one to two times per month) of both the claimant's physical and mental impairments. The ALJ's reasons for rejecting Dr. Shah's opinion do not reflect the appropriate analysis because two of the three reasons (that she continued to smoke and she was released for noncompliance) go more to undermining the claimant's credibility than they reflect on Dr. Shah's opinion, leaving only the ALJ's own assessment that Dr. Shah's regular findings were "essentially unremarkable." Such a failure of analysis is particularly problematic where, as here, the ALJ appeared to adopt the state physicians' findings but failed to explain the differences between their own RFC assessments, Dr. Shah's, and the ultimate RFC the ALJ determined. *Drapeau v. Massanari*, 255 F.3d 1211, 1214 (10th Cir. 2001) (A reviewing court is "'not in a position to draw factual conclusions on behalf of the ALJ.'"), *quoting Prince v. Sullivan*, 933 F.2d 598, 603 (7th Cir. 1991). *See also Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004) (noting that the ALJ may not "pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence."), *citing Switzer v. Heckler*, 742 F.2d 382, 385-386 (7th Cir. 1984) ("Th[e] report is uncontradicted and the Secretary's attempt to use only the portions favorable to her position, while ignoring other parts, is improper.") [citations omitted].

Furthermore, Social Security regulations provide for the proper consideration of "other source" opinions such as that provided by Mr. Mann herein. *See, e. g., Frantz v. Astrue*, 509 F.3d 1299, 1302 (10th Cir. 2007) (noting that other source opinions should be evaluated with the relevant evidence "on key issues such as impairment severity and functional effects" under the factors in 20 C.F.R. §§ 404.1527, 416.927), *quoting* Soc. Sec. Rul. 06-03p, 2006 WL 2329939, at *1 (Aug. 9, 2006). *See also* Soc. Sec. Rul. 06-03p, 2006 WL 2329939, at *6 ("[T]he adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."). The factors for evaluating opinion evidence from "other sources" include: (i) the length of the relationship and frequency of contact; (ii) whether the opinion is consistent with other evidence; (iii) the extent the source provides relevant supporting evidence; (iv) how well the source's opinion is explained; (v) whether claimant's impairment is related to a source's specialty or area of expertise; and (vi) any other supporting or refuting factors. *See* Soc. Sec. Rul. 06-03p, 2006 WL 2329939, at *4-5; 20 C.F.R. §§ 404.1527(d), 416.927(d). The ALJ made reference to these factors, but it is nevertheless unclear whether he considered any of them. *See, e. g., Anderson v. Astrue*, 319 Fed. Appx. 712, 718 (10th Cir. 2009) ("Although the ALJ's decision need not include an *explicit discussion* of each factor, the record must reflect that the ALJ *considered* every factor in the weight calculation.") [emphasis in original]. Instead, the ALJ simply noted that a statement as to the claimant's ability to work is the decision of

the Commissioner. While the Court agrees that the ALJ was not required to give controlling weight to Mr. Mann's opinion that the claimant could not return to work, *see, e. g.,* 20 C.F.R. § 404.1527(d)(1) ("We are responsible for making the determination or decision about whether you meet the statutory definition of disability. . . . A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."), he *was* required to determine the proper weight to give that opinion by applying the factors in 20 C.F.R. § 404.1527. Instead, the ALJ simply declined to give it controlling weight because it was not his own finding and neglected to discuss the remaining evidence. *See Langley,* 373 F.3d at 1119. *See also Miller v. Barnhart*, 43 Fed. Appx. 200, 204 (10th Cir. 2002), *quoting* Soc. Sec. Rul. 96-5p, 1996 WL 374183, at *3 (July 2, 1996) ("If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record."). In making such a finding, the ALJ completely ignored Mr. Mann's statements as to the claimant's diagnoses, their treatment relationship, and his observations of the claimant, including unsuccessful work attempts. *See, e. g., Clifton*, 79 F.3d at 1010 ("[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.") *citing Vincent ex rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-1395 (9th Cir. 1984).

Because the ALJ failed to properly analyze evidence of record as to the claimant's limitations, the Commissioner's decision must be reversed and the case remanded for

further analysis of *all* the evidence in the record by the ALJ.  If such analysis results in adjustments to the claimant's RFC, the ALJ should re-determine what work the claimant can perform, if any, and ultimately whether she is disabled.

## Conclusion

The Court hereby FINDS that correct legal standards were not applied by the ALJ, and the Commissioner's decision is therefore not supported by substantial evidence.  The decision of the Commissioner is accordingly REVERSED and the case is REMANDED for further proceedings consistent herewith.

**DATED** this 24th day of March, 2016.

_____
**STEVEN P. SHREDER**
**UNITED STATES MAGISTRATE JUDGE**